25-mj-6748-MPK<br>
25-mj-6749-MPK

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Samuel Paulay, being sworn, depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed as a Special Agent with the FBI since March of 2024, and am currently assigned to the Boston Field Office, Metro Boston Gang Task Force ("MBGTF"). I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2. Since 2024, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, drug related crimes, white collar crimes, search warrant applications, and various other crimes. Since October of 2024, I have been assigned to work on federal gang investigations on a violent crime and gang task force. During my training and experience, I have become familiar with the methods and techniques associated with the distribution of drugs, the laundering of drug proceeds, and the organization of drug conspiracies run by members and associates of street gangs and other criminal enterprises. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term drug investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; conducting court-authorized Title III wiretap investigations; and preparing and executing search warrants that have led to substantial seizures of drugs, firearms, and other contraband.

1

3. Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws. I know that it is a violation of Title 21 U.S.C. §§ 841(a)(1) and 846, for any person to conspire to, or to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## PURPOSE OF AFFIDAVIT

4. I submit this affidavit in support of a Criminal Complaint charging Kerry CHARLOTIN ("CHARLOTIN"), a/k/a "KG," DOB: xx/xx/1989, and Shaquylle BURDEN ("BURDEN"), DOB: xx/xx/1994, with violating Title 21, United States Code, Section 846 (conspiracy to distribute, and possess with intent to distribute, fentanyl).

5. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the FBI and other federal, state and local law enforcement agencies.

6. I submit this affidavit for the limited purpose of establishing probable cause to believe CHARLOTIN and BURDEN have committed the above offense. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## PROBABLE CAUSE

I. **Investigation Background**

7. The FBI MBGTF are investigating a drug trafficking organization ("DTO") involving CHARLOTIN and BURDEN, who has been selling drugs, including fentanyl, in the Boston area, since at least June 2025. Under the FBI's direction, an FBI Cooperating Witness

("CW-1")[1] has made several controlled buys of narcotics from CHARLOTIN and BURDEN, including on October 16, 2025 and December 3, 2025, which were audio and video recorded. The investigation has consisted of various investigative techniques, including (but not limited to) physical surveillance, records checks, and controlled purchases, including controlled purchases of fentanyl from CHARLOTIN and BURDEN.

8. For the controlled buys in this investigation, law enforcement followed the following procedures: law enforcement officers first searched CW-I and his/her vehicle for money and contraband. Officers then provided to CW-1 Official Agency Funds ("OAF") and a recording device and transmitter for use in the purchase. Officers then directed CW-1 to make a controlled purchase of drugs and conducted surveillance while CW-1 drove to a prearranged location to meet CHARLOTIN, and subsequently BURDEN, throughout the respective transaction, and as CW-1 drove back to a prearranged meet location to meet with officers. There, officers retrieved the narcotics and recording and again searched CW-1 and his/her vehicle for contraband and money, with negative results.

9. During the investigation, I have learned about the membership and criminal activities of a Boston-based DTO. The investigation has revealed that the DTO distributes controlled substances, including fentanyl in the Boston area. It has also revealed that DTO

---

[1] CW-1 has been cooperating with law enforcement since approximately July 2020. CW-1 is cooperating with law enforcement for financial compensation. CW-1 has a criminal history that includes prior arrests for assault and battery with a dangerous weapon, breaking and entering, and possession of a Class A controlled substance. On previous occasions, CW-1 has accurately identified, and corroborated events and individuals involved in active criminal investigations, including drug and firearm investigations. CW-1's information has led to previous search warrants, arrests, and seizures related to drugs and firearms. At the direction of law enforcement, the CW-1 has conducted controlled purchases of evidence in conjunction with criminal investigations. Based on the corroboration, including recordings, I believe that CW-1's information is reliable. CW-1 is willing to testify in this investigation.

members work together to conduct controlled purchases and maintain stash houses (where members store controlled substances and drug trafficking proceeds). The investigation has shown that CHARLOTIN and BURDEN are involved in trafficking of fentanyl in conjunction with other DTO members, including during several of the controlled purchases during this investigation, described below.

## II. Controlled purchases

### a. October 16, 2025

10. On October 16, 2025, CW-1 conducted a controlled purchase of drugs from CHARLOTIN. Leading up to this controlled purchase, CW-1 communicated with CHARLOTIN on CHARLOTIN'S phone (the "TARGET PHONE") and arranged to purchase 50 grams of fentanyl from CHARLOTIN for $3,000. CHARLOTIN agreed to meet with CW-1 to complete the sale on October 16, 2025 in Brookline, MA. Investigators viewed CW-1's call history and messages and confirmed that CW-1 contacted the TARGET PHONE when arranging the transaction.

11. Following these communications, investigators directed CW-1 to meet with CHARLOTIN for the controlled purchase. Investigators searched CW-1 and CW-1's vehicle for money and contraband with negative results. Investigators provided CW-1 with a transmitter, three audio/video recording devices, and $3,000 in Official Agency Funds, and instructed CW-1 to make a controlled purchase of fentanyl from CHARLOTIN. Investigators maintained surveillance of CW-1 as CW-1 traveled to the meeting location that CW-1 agreed upon with CHARLOTIN.

12. Investigators observed CW-1 park at the agreed upon meeting location. Shortly after, investigators observed CHARLOTIN arrive at the meeting location in the gray Toyota

Corolla. I have learned that the gray Toyota Corolla is registered to CHARLOTIN. Further, investigators have observed CHARLOTIN driving this vehicle during multiple occasions including on October 1, and October 2, 2025, during which investigators observed CHARLOTIN departing from and returning to his residence in Rockland, MA, and utilizing this vehicle throughout hours of the day and night.

13. Investigators observed CHARLOTIN walk to CW-1's vehicle. Investigators observed, via the transmitter, the CW-1 begin to drive. Investigators then heard CW-1 speaking with CHARLOTIN. Minutes later, investigators observed that CW-1 was alone in his/her vehicle. CW-1 then departed the area.

14. While conducting surveillance of the controlled purchase, investigators observed CHARLOTIN get out of a nearby silver Lexus and re-enter the gray Toyota Corolla. Investigators have previously observed BURDEN driving what I believe to be the same silver Lexus, when he met with CHARLOTIN on October 2, 2025. Investigators have reviewed MA Registration of Motor Vehicles ("RMV") and MA Department of Corrections photographs of Shaquylle BURDEN. I believe these photographs of BURDEN are the same individual observed by investigators via physical surveillance and recorded during controlled purchases of drugs by CW-1 that were dispatched by CHARLOTIN.

15. Investigators maintained surveillance of CW-1 as he/she drove back to a pre-determined meeting location. CW-1 provided investigators with the transmitter, the audio/video recording devices, and a clear plastic bag containing a brown powder substance. The brown powder substance weighed 53.33 grams. Investigators tested the brown powder substance using a TruNarc Raman Spectrometer. The brown powder substance tested positive for the presumptive presence of fentanyl compound/methamphetamine. Investigators searched CW-1's person and

vehicle for money and contraband with negative results.

16. The suspected controlled substance was entered into evidence and subsequently sent to the DEA Laboratory, which found that the substance was identified as fentanyl with a net weight of approximately 51.17 grams.

17. During a debriefing CW-1 told investigators the following: that he/she arrived at the meeting location that he/she and "KG" (CHARLOTIN) had agreed upon and parked; that CW-1 saw KG arrive and park across the street and CW-1 also saw KG's partner pull up in a silver Lexus; that KG's partner (BURDEN) was bald and had a tattoo on his face and CW-1 also recognized KG's partner from prior controlled purchases; that the silver Lexus drove by CW-1 and CW-1 subsequently followed the silver Lexus; once the silver Lexus parked, KG got out of the silver Lexus and got into the front passenger seat of CW-1's vehicle; that KG then handed CW-1 the clear plastic bag containing the brown powder substance and in exchange, CW-1 handed KG the $3,000.00 of Official Agency Funds; that CW-1 began driving again with KG in the vehicle and following the silver Lexus, and CW-1 stopped when the silver Lexus stopped; and that KG then got out of CW-1's vehicle and CW-1 subsequently departed and drove directly to the pre-determined meeting location. KG's partner that CW-1 recognized from previous controlled purchases is known to investigators to be Shaquylle BURDEN.

18. Investigators reviewed the audio/video recording following the controlled purchase. The audio/video recording is consistent with CW-1's account of the events. During the recording, investigators observed CHARLOTIN meeting with CW-1 in CW-1's vehicle. CHARLOTIN removes the clear plastic bag containing the brown powder substance and exchanges it with CW-1 for the official agency funds. CHARLOTIN wore a black North Face coat, dark sunglasses, and jeans with a yellow smiley face on them. Investigators also reviewed

footage from a pole camera in the vicinity of CHARLOTIN's home address in Rockland, MA. Approximately one hour earlier, CHARLOTIN exited the address wearing what appears to be the same clothing seen in the meeting. CHARLOTIN is seen getting into the gray Toyota Corolla, that he arrived in at the buy, and depart his home address in Rockland, MA.

      b. <u>December 3, 2025</u>

19. On December 3, 2025, CW-1 conducted another controlled purchase of drugs from BURDEN and CHARLOTIN. Leading up to this controlled purchase, CW-1 communicated with CHARLOTIN on the TARGET PHONE and arranged to purchase 50 grams of fentanyl from CHARLOTIN for $3,000. CHARLOTIN agreed to meet with CW-1 to complete the sale on December 3, 2025 in Brookline, MA. Investigators viewed CW-1's call history and messages and confirmed that CW-1 contacted the TARGET PHONE when arranging the transaction.

20. Investigators established electronic surveillance of BURDEN's residence in Roslindale, MA, via pole camera. At 2:46 pm, investigators observed, via pole camera, BURDEN exit the residence wearing a white shirt, black pants, and black and white sneakers. BURDEN entered the driver seat of a gray Honda Civic, parked outside the residence and departed at 2:47 pm.

21. At approximately the same time, investigators met with CW-1 in preparation for the controlled purchase. Investigators directed CW-1 to meet with CHARLOTIN for the controlled purchase. Investigators searched CW-1 and CW-1's vehicle for money and contraband with negative results. Investigators provided CW-1 with a transmitter, audio/video recording devices, and $3,000 in official agency funds, and instructed CW-1 to make a controlled purchase of fentanyl from CHARLOTIN. Investigators maintained surveillance of CW-1 as CW-1 traveled to the address in Brookline, MA.

22. CW-1 arrived at the same meeting location that CW-1 had previously met with CHARLOTIN during the controlled purchase on November 6, 2025. A short time after arrival at this location, CW-1 spoke to CHARLOTIN on the TARGET PHONE. CHARLOTIN confirmed with CW-1 that CW-1 was at the same location as last time and hung up.

23. At 3:29 pm, investigators observed the gray Honda Civic arrive and park across the street from CW-1's vehicle. Investigators observed BURDEN exit the driver's door of the gray Honda Civic wearing a white shirt, black pants, and black and white sneakers and enter the front passenger door of CW-1's vehicle. Investigators observed, via transmitter, BURDEN sitting in the front passenger seat of CW-1's vehicle.

24. Investigators observed, via transmitter, CW-1 exchange the official agency funds with BURDEN for a clear plastic bag containing an off-white substance. Investigators heard, via transmitter, CW-1 say, "I thought you said you was fucking home?" Investigators heard, via a transmitter, a male's voice from the cell phone that BURDEN was holding respond, "I didn't say I was home." Investigators believe the male on BURDEN's cell phone was CHARLOTIN and the discussion of not being home was referring to CW-1 and CHARLOTIN's conversation during the November 6, 2025 controlled purchase, during which, CHARLOTIN told CW-1 that he would be travelling to South Carolina.

25. Investigators heard and observed BURDEN say to CW-1, "I'll have him call you, alright?" BURDEN then told CHARLOTIN to call CW-1.

26. Investigators observed BURDEN exit CW-1's vehicle, get back into the driver's seat of the gray Honda Civic, and depart. Investigators maintained surveillance of both BURDEN and CW-1 as they departed the area. CW-1 departed at 3:30 pm. BURDEN departed at 3:32 pm.

27. Simultaneously, investigators maintained surveillance of CW-1 as CW-1 drove to a pre-determined meeting location. CW-1 provided investigators with the transmitter, the audio/video recording devices, and a clear plastic bag containing an off-white powdery substance. The off-white powdery substance weighed 53.63 grams. The substance field tested positive for the presence of fentanyl compound/methamphetamine. Investigators searched CW-1 and CW-1's vehicle for money and contraband with negative results.

28. The suspected controlled substance was entered into evidence and subsequently sent to the DEA Laboratory, and lab results are currently pending.

29. During a debriefing, CW-1 provided the following account: CW-1 departed the pre-determined meeting location and drove directly to the area in Brookline, MA that CW-1 had arranged to meet with "KG" (CHARLOTIN); CW-1 arrived and communicated with "KG" via cell phone during which time "KG" confirmed CW-1's exact location; "KG's" associate (BURDEN) got into the front passenger seat of CW-1's vehicle; "KG's" associate was on his cell phone with a voice CW-1 recognized as "KG"; CW-1 spoke to "KG" through his associate's phone telling him that CW-1 thought he was home; "KG" responded that he didn't tell CW-1 he was home. CW-1 exchanged the $3,000 official agency funds with "KG's" associate for the fentanyl.

30. Investigators reviewed the audio/video recording following the controlled purchase. The audio/video recording is consistent with CW-1's account of the events. During the recording, investigators observed BURDEN get into the front passenger seat of CW-1's vehicle. BURDEN handed CW-1 a clear plastic bag containing an off-white substance and CW-1 handed BURDEN the official agency funds. Investigators observed BURDEN holding a cell phone and heard and observed the conversation quoted above.

31. BURDEN's distinct tattoos are clearly visible in the video including; a cursive style "A" to the left of his left eye in black ink, other letters above his left eyebrow in black ink, a filled in circle within a black ring on his left forearm in black ink, a gun on his left forearm in black ink, and a skeleton on his right forearm in black ink. These same tattoos are detailed and pictured in BURDEN's booking information from the Boston Police Department obtained by investigators on July 30, 2025.

## CONCLUSION

32. Based on the foregoing, there is probable cause to believe that on various dates, including from on or about October 16, 2025 through on or about December 3, 2025, in Brookline, in the District of Massachusetts, and elsewhere, that CHARLOTIN and BURDEN, did conspire to distribute, and possess with intent to distribute, fentanyl, in violation of Title 21, United States Code, Section 846.

I declare the foregoing is true and correct.

/s/ Samuel Elliot Paulay

Special Agent Samuel Elliot Paulay
Federal Bureau of Investigation

Electronically sworn to and subscribed telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on December __10__, 2025.



_____
HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE